194-15

ORIGINAL

NO. PD-0194-15

IN THE COURT OF APPEALS
FOR THE FIFTH DISTRICT OF TEXAS
AT DALLAS

---

IN THE 5th DISTRICT COURT
DALLAS COUNTY, TEXAS

---

WILLIAM PAUL LANGRUM II
Appellant

V.

THE STATE OF TEXAS
Appellee

---

PETITION FOR DISCRETIONARY REVIEW
OF APPELLANT WILLIAM PAUL LANGRUM II

---

ORAL ARGUMENT NOT REQUESTED

FILED IN
COURT OF CRIMINAL APPEALS

MAR 12 2015

Abel Acosta, Clerk

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAR 10 2015

Abel Acosta, Clerk

## STATEMENT REGARDING ORAL ARGUMENT

Oral arguments in this entitiled cause of action is not necessary, unless otherwise requested by the Honorable Justices for the Texas Court of Criminal Appeals, as the issues herein raised in this entitled Petition for Discretionary Review can be decided based upon review of the official trial court/appellate records and the legal precedent-arguments in support of same without the need of Oral Arguments. See: Texas Rules of Appellate Procedure, Rule 39.7, and Rule 68.4 (c).

I

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT .......................I

INDEX OF AUTHORITIES ..................................III

STATEMENT OF THE CASE AND ISSUES ......................01

ISSUES PRESENTED ....................................02

STATEMENT OF THE FACTS ..............................02-05

SUMMARY OF THE ARGUMENT ............................05

ISSUE NO. 01 .......................................05-09

    THE EVIDENCE IS LEGALLY INSUFFICIENT TO
    SUPPORT THE CONVICTION FOR CAPITAL MURDER

ISSUE NO. 02 .......................................09-12

    THE EVIDENCE OF AN EXTRANEOUS OFFENSE WAS
    NOT SAME TRANSACTION CONTEXTUAL EVIDENCE

PRAYER ............................................12

CERTIFICATE OF SERVICE ............................13

# LIST OF AUTHORITIES

CASES:

ATES vs STATE 644 S.W.2d 843
(Tex.App. 1982) .................................07

DEVOE vs STATE 354 S.W.3d 457
(Tex.Crim.App. 2011) ..........................10

FLORES vs STATE 551 S.W.2d
(Tex.Crim.App. 1974) ..........................06,08

SIMMONS vs STATE 504 S.W.@D 465

(Tex.Crim.App. 1974) ..........................11

URBANO vs STATE 837 S.W.2D 114
(Tex.Crim.App. 1992) ..........................07

WILBOURN vs STATE 524 S.W.2d 306
( Tex. Crim. App. 1975) ..........................10

WRIGHT vs STATE 603 S.W.2d 838
( Tex. Crim. App. 1980) ..........................08


RULES:

Tex.R.App. P.66.3(a) ..........................01

Tex.R.App. P.68.1 ..........................01

Tex.R. Evid. 404(b) ..........................11,12

# APPELLANT'S PRO-SE PETITION FOR DISCRETIONARY REVIEW

TO THE HONORABLE JUSTICES FOR THE TEXAS
COURT OF CRIMINAL APPEALS:

Comes now, William Paul Langrum II, Appellant/Petitioner proceeding pro-se. without the aid and/or assistance of counsel in this entitled numbered cause of action, who in accordance with Texas Rule of Appellate Procedure, Rule 66.3 (a), and Rule 68.1, and hereby files Petition for Discretionary Review, and in support thereof, the Appellant/-Petitoner will argue and show unto the Justice for the Texas Court of Criminal Appeals the following to-wit:

## I

## PRELIMINARY STATEMENT OF THE CASE AND ISSUES

1) This cause of action commenced on September 11, 2013 upon the Appellant/Petitioner's plea of not guilty (RR:Vol.4 pg.9). The jury found Appellant/Petitioner guilty and was sentenced to life imprisonment without the possibility of parole.

2) Notice of appeal was timely filed in the Court of Appeals on October 28, 2013.

3) The Fifth Court of Appeals affirmed the Judgment and Sentence. (Copy of The Court of Appeals Opinion is Enclosed)

1

## ISSUES PRESENTED

ISSUE ONE: WHETHER THE COURT OF APPEALS ERRED IN IT'S OPINION OF SUFFICIENCY OF EVIDENCE.

ISSUE TWO: WHETHER THE COURT OF APPEALS ERRED IN IT'S OPINION OF EXTRANEOUS OFFENSE EVIDENCE.

## STATEMENT OF THE FACTS

Sophia Dorian lived at a condominium complex located at the 9800 block of Royal Lane, in Dallas, Texas. On the night of September 21, 2011, around 10:25, Dorian heard what - "sounded like squabbling" outside.

Dorian described the car she saw drive away as a "metallic-blue four-door kind of smaller boxy car." She could not see an individual in the car but caught a glimpse of what looked like "a patch of a white shirt" in the drivers' seat.

Nicole Green, who lived next door to Bennett, testified that on September 21, 2011, she heard a woman hollering for help. She looked out her window and saw a small, older-model, four-door Honda Accord. Green could not tell the cars color, but saw a black arm and white shirt.

The medical examiner, Dr. Nathaniel Patterson of the Southwestern Institute of Forensic Sciences (SWIFS), testified that Bennett suffered stab wounds to the chest. The fatal stab wound went into the right atrium of Bennetts' heart and through the right pulmonary vein and into the right middle lobe of

2

of Bennetts' lung, and this caused approximately 740 milliliters of blood to leak into Bennetts' chest cavity.

Later that evening, at around 11:10 PM, Dallas Police Officer Russell Barrett was at 2800 Douglas, in an undercover capacity when he witnessed Appellant and another individual, Jeremy Francis, involved in an altercation with a third man, Charles Starks. The undercover officer saw Appellant holding a "large styled--hunting knife" in his hand, and he appeared to be trying to take a bag from Starks. Officer Barrett called for assistance from uniformed police officers.

A squad car got behind the vehicle which was headed north on Maple. Officer Barrett saw the squad car turn its lights and sirens and pull the vehicle over. Appellant and francis got out of the vehicle and fled on foot, were chased by police, and then got back in the car and drove away. Officer Barrett heard over the police radio that a robbery had occured at 2800 Douglas; he responded he had seen the robbery.

The officers followed the vehicle for approximately five miles to the 7100 block of Lemon Avenue, where it was disabled after hitting a curb. Appellant and Francis got out of the car and fled in opposite directions. Appellant fled in a northeastern direction of Lemon until he reached the edge of a car dealership, where he dropped the knife and continued running. Appellant was handcuffed and taken into custody. Officer Barrett retrieved the knife Appellant threw away.

The vehicle Appellant was driving, a 1995 Honda Accord, had been reported stolen earlier that day by Kimberly Thomas,

Appellants' former girl-friend.  Thomas testified that she spoke to Dallas police detective Dale Lundberg, the lead detective in the investigation, in September 2011, but did not recall telling him that Appellant told her he could not find a job, so he was going to start robbing people.

During the search of the Honda Accord, various items were seized, including a handbag and gym bag.  A towel, camera, notebook, screwdriver, pager, and "doo-rag" were found in the handbag. Mail addressed to Appellant was found in the trunk of the vehicle.  Pictures of Appellant on the camera led Detective Lundberg to believe the handbag did not belong to Bennett.  Lundberg also testified that the handbag did not match descriptions he was given by people who knew Bennett as a type of handbag Bennett would have carried.

The State presented forensic evidence.  Alexander Nham, a forensic biologist with the SWIFS, confirmed the presence of blood on the knife and towel, as well as on Appellants' t-shirt, underwear, and shorts.  Ken Balagot, a forensic biologist with SWIFS, and a DNA analyst, testified that the DNA from the knife came from a single female and matched the DNA profile of Bennett at a random match probability of one in 573 billion. The stain from the towel included the DNA profiles of both Bennett and Appellant, with a random match probability to Bennett of one in 573 billion, and random match probability to Appellant of one in 4.55 trillion.  The DNA from the white t-shirt matched Appellants' DNA profile, with a random match probability to Appellant of one in 4.55 trillion, and lower level genetic markers matched

4

markers matched the DNA profiles of Bennett (random match probabi-
-lity of 63 in 100), Francis ( random match probability of 1 in 4),
Onesimo  BenetiZ (random match probability of 63 in 100), and
Martin Coronado (random match probability of 1 in 4).

The defense rested without calling any witnesses.  The jury
found Appellant Guilty of capital murder as charged in
the inictment.  Appellant was sentenced to life in prison without
the possibility of parole.

Appellant filed direct appeal bried in the Fifth Court of
Appeals Texas at Dallas on May 8, 2014.  The opinion of the
Court was filed on February 2, 2015 by Justice Myers.

## SUMMARY OF THE ARGUMENT

In his first issue, Appellant/Petitioner argues, that the
Court of Appeals erred in its opinion of Sufficiency of evidence
to support the conviction for capital murder.  In his second
issue, Appellant/Petitioner argues that the Court of Appeals
erred in its opinion of extraneous offense evidence as same
transaction contextual evidence.

## APPELLANTS/PETITIONER'S ISSUE NO. 1

### THE EVIDENCE IS LEGALLY INSUFFICIENT TO
### SUPPORT THE CONVICTION FOR CAPITAL MURDER

Appellant/Petitioner submits that the Court of Appeals
erred in its finding that evidence presented at trial was sufficient
to support the conviction for capital murder.  The Court of Appeals

5

opinion conflicts with other opinions with similiar circumstances and pertaining to the contesting of sufficiency of evidence.

## STANDARD OF REVIEW

In criminal cases, a judgment of conviction, to be sustained on appeal, must be supported by evidence that produces a moral certainty of the guilt of the accused to the exclusion of every reasonable doubt. The evidence will be insufficient to sustain the conviction where, although not leaving the accused free from suspicion of guilt, it still fails to show his guilt to a moral certainty, so as to exclude all reasonable doubt. In ascertaining whether the guilt of the accused has been established to a moral certainty, the Appellate Court will review the evidence in light of the presumption that the accused is innocent. The court will not presume any acts against the accused that are not shown to have been committed by him. Furthermore, a conviction will not be sustained on appeal if the evidence does not sufficiently establish all material elements of the offense charged.
FLORES vs STATE 551 S.W.2d 364

It is a well recognized principle of law in this state, to sustain a conviction, it should appear ont only that an offense as charged has been committed, but there should also be proof to a degree of certainty greater than a mere probability or strong suspicion tending to establish that the party charged was the person who committed it or was a participant in its commission. There must be legal and competant evidence pertinently identi-

6

-fying the defendant with the transaction constituting the offense charged against him. ATES vs STATE 644 S.W.2d 843)

In the opinion from the Court of Appeals, Fifth District of Texas at Dallas, the opinion is in conflict with other opinions herein, about the standards of sufficient evidence to sustain a conviction.

First of all, the Court of Appeals, indicates no positive identification of appellant at the crime scene was provided into evidence. The Court said "...although no one actually saw Appellant stab Bennett, the evidence suggests she was stabbed before she moved away from the Honda vehicle and collapsed on the ground". In the ATES opinion, "before an accused may be convicted the evidence must demonstrate beyond a reasonable doubt that the accused is the person who committed the offense". The Court relies on no evidence to pertinently identify Appellant/Petitioner with the offense as charged.

Additionally, the Court of Appeals opinions that "various--items belonging to Bennett were found scattered on the ground near her body is circumstantial evidence that Appellant attempted to rob Bennett". This reasoning is illogical and it would indirectly suggest that any person who falls and whos belongings are scattered has been robbed or attempted to be robbed. As in URBANO vs STATE 837 S.W.2d 114, where the Court stated, "certainly,- the evidence raises a strong suspicion that Appellant acted with the gang rules in mind, that is, that he murdered with an expectation of tangible benefit. But Appellants' intent or state of mind with respect to an expectation of benefit was not proven to a

7

high degree of certainty. Rational jurors could not conclude beyond a reasonable doubt simply from Appellants' membership in the gang that he was aware of all the gangs' rules". The Court of Appeals relies on an unreasonable inference to support its opinion and the case at bar.

Furthermore, the Court of Appeals emphasizes a statement, that the jury elected to take a witness as "not being truthful", as to come to a conclusion of guilt beyond a reasonable doubt. While it is true that the trier of facts, is entitled to accept or reject any or all of the testimony adduced, a rejection of testimony does not mean that the missing elements of the offense are supplied. WRIGHT vs STATE 603 S.W.2d 838. In the instant case, the Court said, "the jury was free to determine that Appellants' former girlfriend, Thomas, was not being truthful when she did not recall telling Detective Lundberg that Appellant said he was going to start robbing people because he could not find a job".

The burden of proof is on the State, and it is incumbent on the State to prove every element of the offense. Evidence is not deemed to be sufficient because the trier of facts does not believe a witness testimony, Thomas, was a witness for the State, thus, the Court of Appeals has relied on inference stacking, by a jury, to sustain a conviction.

The Court of Appeals opinions that "DNA from Appellants' t-shirt matched the DNA profiles of both Appellant and Bennett". The Court of Appeals points out nothing to show when the stain could have been made nor is there any indication where the stain is on the t-shirt. In FLORES, the Court opinioned that, "blood-

8

-stains were found on the Chryslers' front seat and on Appellants' shirt, but it was not shown when the stains could have been made". In the case at bar, the Court fails to show how, when and where this stain occurs.

In summary, the Court of Appeals opinion reflects major contradictions in opinion with other rulings. The Court of Appeals fails to support its opinion, 1) to identify Appellant/ Petitioner to the offense, 2) to reach a moral certainty of the offense, 3) misapplies rejection of testimony, and 4) does not clarify DNA evidence.

## APPELLANT/PETITIONERS' ISSUE NO.2
### THE EVIDENCE OF AN EXTRANEOUS OFFENSE WAS NOT SAME TRANSACTION CONTEXTUAL EVIDENCE

Appellant/Petitioner submits that the Court of Appeals erred by overruling Appellant/Petitioners' contestment for abuse of discretion. The Court of Appeals decision is contrary to and conflicts with other opinions with similiar circumstances and pertaining to the contesting of abuse of discretion involving extraneous offense evidence.

## STANDARD OF REVIEW

The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial courts' action. Rather, it is a question of whether the court actedwithout reference to any guiding rules and

9

principles. Another way of stating the test is whether the act was arbitrary or unreasonable. The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner that an appellate judge in a similiar circumstance does not demonstrate that an abuse of discretion has occured.

Thus, judicial rulings will be affirmed if the trial court follows the appropriate analysis and balancing factors, though the Appellate Court might disagree with the weight given to those individual factors. In short, a trial court judge is given a "limited right to be wrong", so long as the result is not reached in an arbitrary or capricious manner.

The Court of Appeals opinions that the instant offense and a subsequent extraneous offense were the same transaction contextually. This opinion conflicts with the opinion in WILBOURN vs STATE 524 S.W.2d 306. "In a trial for murder with mailce, evidence of an extraneous offense of burglary which occurs some two to two and a half hours after the commission of the murder and some seven or eight miles away from the scene of the murder is not admissible because there is no showing that it is part of the same continuing transaction". The Court of Appeals does not explain nor indicate how the case at bar and the extraneous offense are interwoven. Appellant/Petitioner appreciates the difficulties associated with establishing what is not in the record. However, arbitrary or capricious decisions should not be upheld.

The Court of Appeals relies on DEVOE vs STATE 354 S.W.3d 457, in which "defendant did not rest between incidents and he stole the

10

gun to go after women and to then effectuate his flight".
In the instant case the Court of Appeals articulates nothing
tying the two individual crimes together. No guiding rules have
been demonstrated in the Court of Appeals opinion, to support
the trial courts finding of same transaction contextual evidence.

Additionally, the Court of Appeals opinions that "the —
-recovery of the knife and the Honda would have been difficult.
to explain to a jury without referring to the aggravated robbery
that first brought Appellant to the polices' attention".
However, the Court of Appeals has misconstrued the plain
language of the draftsmen as to when same transaction contextual
evidence is admissible. "Same transaction contextual evidence is
admissible as an exception under rule 404(b) only when the offense
would make little or no sense without also bringing in that
evidence, and only to the extent it is necessary to the jurys'
understanding of the offense.

The exception under rule 404(b) is clear and nonconfusing
language. "Only" is exhaustive and exclusive under rule 404(b),
the Court of Appeals opinion changes the language the draftsmen
clearly stated. A proper application under rule 404 (b), occurred
in SIMMONS vs STATE 504 S.W.2d 465. The Court in SIMMONS
opinioned that "Simmons first burglarized a residence on
August 2, returned on August 3 to obtain property that he could
not carry away before and on that occasion was surprised by the
deceased. The Court of Appeals said that evidence of the
burglaries was admissible because it was so interconnected with
the commission of the murder that it could not be seperated and

11

was, therefore, admissible as res gestae to show the context in which the murder occured". Here the Court of Appeals opinion does not attach the two crimes together. As such the Court of Appeals has misconstrued rule 404 (b) "exception" to allow same transaction contextual evidence.

The Court of Appeals opinion slants the language used in the exception to rule 404 (b). The language used is more than a constuct of idealism, instead, the language is a reality that must be applied minus contortion.

For the reasons stated above Appellant/Petitioner submits that the Court of Appeals, Fifth District of Texas at Dallas, has erred in overruling Appellant/Petitioners' trial court error for abuse of discretion.

## PRAYER FOR RELIEF

WHEREFOR, PREMISES CONSIDERED,

Appellant/Petitioner respectfully prays that the 'Judgment' be reversed and the cause 'Remanded' for a new trial.

Respectfully Submitted,

*William Paul Langrum II*

William Paul Langrum II
1884962-Polunsky Unit
3872 FM 350 South
Livingston, Tx 77351

12

## Certificate of Service

I hereby certify that a true copy of the foregoing Petition for Discretionary Review has been served on Lori Ordiway, Assistant District Attorney for Dallas County-Appellate Section, Frank Crowley Courts Building, 133 N. Riverfront Blvd., lock box 19, Dallas, Texas 75207-4399 by depositing same in the United States Mail, Postage Prepaid, on this the ___3___, day of _March_ , 2015.

_William Paul Langrum II_
Petitioner,
William Paul Langrum II

13

AFFIRMED; Opinion Filed February 2, 2015.



In The

## Court of Appeals
## Fifth District of Texas at Dallas

No. 05-13-01489-CR

WILLIAM PAUL LANGRUM, Appellant
V.
THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 5
Dallas County, Texas
Trial Court Cause No. F11-60330-L

# OPINION

Before Justices Bridges, Lang-Miers, and Myers
Opinion by Justice Myers

Appellant William Paul Langrum was convicted of capital murder and sentenced to life imprisonment without the possibility of parole. In two issues, he argues (1) the evidence is insufficient to support the conviction; (2) the trial court erred by overruling appellant's objection to the use of evidence of an aggravated robbery allegedly committed by appellant approximately 45 minutes after the instant offense. We affirm.

### BACKGROUND

Sophia Dorian lived at a condominium complex located at the 9800 block of Royal Lane, in Dallas, Texas. The complex's designated parking area was on the street directly in front of the upstairs unit where Dorian lived, and decedent Shearl Bennett's assigned parking space was next to Dorian's. On the night of September 21, 2011, Dorian was in her condo with a guest when she heard what "sounded like squabbling" outside. Dorian testified that this squabbling "kind of

grew louder." She ran to her front door and heard Bennett say, "Oh, my God. Somebody help me. Somebody please help me." Dorian "ripped the door open" and "flew down the steps," where she saw the headlights of a car. At first, she thought "somebody had just had a squabble with their boyfriend or something." Dorian started to retreat, but the car continued to slowly roll forward until she saw Bennett bent over in the open driver's side window of the car. The car drove off, and then Bennett sat down in the grass. Dorian asked Bennett if she was okay. Bennett looked up, closed her eyes, and "just kind of rolled over on her side." Dorian soon noticed her hand was moist from touching Bennett. After realizing Bennett was injured, Dorian looked up at her friend and said, "She's bleeding. She's bleeding."

The vehicle had to turn around to get out of the complex, so it came back towards Dorian and passed in front of her. Dorian told her friend to call 911, and she flagged down the police officers when they arrived. Dorian testified that it was 10:25 p.m. when she and her friend called 911. Dorian described the car she saw as "a metallicy [sic] blue four-door kind of smaller boxy car." She could not see an individual in the car but caught a glimpse of what looked like "a patch of a white shirt" in the driver's seat.

Bennett died at the scene from multiple stab wounds. Her brother, Richard Sapp, testified that she was fifty years old at the time of her death. Some keys, a Bible, and miscellaneous papers were found near the body. Bennett was still wearing her wristwatch and earrings.

The medical examiner, Dr. Nathaniel Patterson of the Southwestern Institute of Forensic Sciences (SWIFS), testified that Bennett suffered stab wounds to the chest, the left side of the upper chest (by the collarbone), and the upper abdomen. The wounds near Bennett's collarbone and to her abdomen were consistent with stab wounds from a single-edged blade. The stab wound to her chest, which was fatal, went into the right atrium of Bennett's heart and through

the right pulmonary vein and into the right middle lobe of her lung, and this caused approximately 740 milliliters of blood to leak into Bennett's chest cavity. Dr. Patterson found no defensive wounds to Bennett's arms or hands.

Nicole Green, who lived next door to Bennett at the condominium complex, testified that on September 21, 2011, she was in bed when she heard a woman hollering for help. She looked out her window and saw a small, older-model four-door Honda Accord[1] drive by. Green knew the car was an Accord because she used "to drive a car like that back in the day." She could not see the driver's face but noticed he was black and wore a white t-shirt. Green ran outside and saw Bennett laying on the ground. A black satchel bag, various cards, Bennett's wallet, and other personal belongings were "kind of all just scattered on the ground," so Green gathered them up and put them in the satchel, which Green believed may have been Bennett's purse. Green stayed with Bennett until the police arrived.

Dallas Police Officer King Seng was the first officer to arrive at the crime scene. He talked to some witnesses and obtained a possible description of the suspect vehicle, which he broadcasted over his police radio. Later that evening, at around 11:10 or 11:13 p.m., Dallas police officer Russell Barrett was at 2800 Douglas, near Lemon Avenue, in an undercover capacity when he witnessed appellant and another individual, Jeremy Francis, involved in an altercation with a third man, Charles Starks. Appellant was the taller individual and wore a white t-shirt; Francis was shorter and wore a blue t-shirt. The undercover officer saw appellant holding a "large-styled hunting knife" in his hand, and he appeared to be trying to take a bag from Starks. Appellant swung the knife at Starks, causing him to fall backwards. Appellant took the bag, after which he and Francis fled on foot, got into a vehicle in a nearby parking lot, and

---

[1] Green did not know the vehicle's color. She testified: "It was like a little four-door Honda Accord, an older model. It could have been black, could have been blue, it could have been green. I don't know. I couldn't tell."

—3—

quickly drove away. Officer Barrett called for assistance from uniformed police officers.

A squad car got behind the suspect vehicle and followed it as it headed north on Maple. Officer Barrett saw the squad car turn on its lights and sirens and attempt to pull the vehicle over, but appellant, who was driving, "started evading them at an even higher speed." Police pursued the car for a few miles until it stopped at Fairmount and Claire. Appellant and Francis got out of the car and fled on foot, were chased by police, and then got back in the car and drove away. By this point, Officer Barrett caught up with the pursuing squad cars, and he and another undercover officer joined the chase. Officer Barrett heard over the police radio that a robbery had occurred at 2800 Douglas; he responded that he had seen the robbery.

The officers followed the suspect vehicle for approximately five miles to the 7100 block of Lemon Avenue, where it was disabled after hitting a curb. Appellant and Francis got out of the car and fled in opposite directions. Officer Barrett pursued appellant, who was still carrying the large knife. Officer Barrett yelled at appellant, "Stop. Police. Drop the knife." Appellant fled in a northeastern direction on Lemon until he reached the edge of a car dealership, where he dropped the knife and continued running. Officer Barrett pursued appellant until he stopped him at gunpoint at the dealership. Appellant was handcuffed and taken into custody. Officer Barrett retrieved the knife appellant threw away, which was admitted at trial.

Officer Richard Stewart testified that on September 21, 2011, he received a call from Officer Barrett regarding a possible aggravated robbery. When he reached the location of the suspected aggravated robbery Officer Stewart saw a green Honda, which he followed as it drove away. Officer Stewart activated his overhead lights and attempted to initiate a traffic stop, but the vehicle did not stop. It eventually pulled over to the side of the road, and both the driver and passenger got out and fled on foot. Officer Stewart chased the driver, who wore a white t-shirt. When the driver attempted to jump a chain link fence, Officer Stewart grabbed him, pulled him

off the fence, and they fell to the ground. The driver got up and ran back towards the car, and drove off. As he drove away, the driver picked up the passenger. Officer Stewart pursued the vehicle for about five miles until it became disabled after hitting a curb on Lemon Avenue. The driver got out of the car holding a knife above his head, and Officers Stewart and Barrett chased the driver on foot. They cornered and arrested him at a car dealership following a brief struggle.

The car appellant was driving, a 1995 Honda Accord, had been reported stolen earlier that day by Kimberly Thomas, appellant's former girlfriend. She testified that she and appellant dated from about 2009 to 2011. Appellant drove the car while they were dating, and when they broke up in early September 2011, appellant left in Thomas's car. The car had been missing for about three weeks when Thomas reported it stolen. Approximately eight to twelve hours after she reported it stolen, Thomas received a telephone call that the car had been found. Thomas testified that she spoke to Dallas Police detective Dale Lundberg, the lead detective in the investigation, in September 2011, but did not recall telling him that appellant told her he could not find a job, so he was going to start robbing people.

During the search of the Honda Accord, various items were seized, including a purse and a gym bag. A towel was found inside the purse. A camera, a notebook, screwdriver, pager, and "doo-rag" were also found in the purse. Mail addressed to appellant was found in the trunk of the car. A picture of appellant on the camera led Detective Lundberg to believe the bag did not belong to Shearl Bennett. Lundberg also testified that the purse did not match descriptions he was given by people who knew Bennett as a type of purse she would have carried. The gym bag was returned to the victim of the robbery.

The State also presented forensic evidence. Alexander Nham, a forensic biologist with the SWIFS, confirmed the presence of blood on the knife and towel, as well as on appellant's t-shirt, underwear, and shorts. Ken Balagot, a forensic biologist with SWIFS, and a DNA analyst,

testified that the DNA from the knife came from a single female and matched the DNA profile of Shearl Bennett at a random match probability of one in 573 billion. The stain from the towel included the DNA profiles of both Bennett and appellant, with a random match probability to Bennett of one in 573 billion, and a random match probability to appellant of 1 in 4.55 trillion. The DNA from the white t-shirt matched appellant's DNA profile, with a random match probability to appellant of 1 in 4.55 trillion, and lower level genetic markers matched the DNA profiles of Bennett (random match probability of 63 in 100) and Francis (random match probability of 1 in 4).

The defense rested without calling any witnesses. The jury ultimately found appellant guilty of capital murder as charged in the indictment. Appellant was sentenced to life in prison without the possibility of parole.

## DISCUSSION

### 1. Sufficiency of the Evidence

In his first issue, appellant argues the evidence is insufficient to support the conviction. Appellant was charged with capital murder, which required the State to prove appellant intentionally caused Bennett's death in the course of committing or attempting to commit robbery. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). The indictment alleged that on or about September 21, 2011, appellant did:

> unlawfully then and there intentionally cause the death of SHEARL BENNETT, an individual, hereinafter called deceased, by STABBING AND BY CUTTING THE DECEASED WITH A KNIFE, A DEADLY WEAPON, and the defendant was then and there in 'the course of committing and attempting to commit the offense of ROBBERY of said deceased.

We review appellant's sufficiency challenge by considering all the evidence in the light most favorable to the verdict; based on that evidence and any reasonable inferences, we must determine whether a rational fact finder could have found the essential elements of the offense

beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014). Under this standard, the fact finder has full responsibility for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. We presume that the fact finder resolved any conflicts in the evidence in favor of the verdict and defer to that determination. *See id.* at 326. We do not reassess witness credibility. *Thornton*, 425 S.W.3d at 303.

Appellant makes several arguments as to why the evidence in this case is insufficient. He contends no one saw him using the knife to stab Shearl Bennett. He argues that, if he stabbed Bennett, "there should have been a vast amount of blood in the vehicle," on appellant, and on his clothing. He also contends there is no evidence anything was stolen or that there was any attempt to commit a robbery, and that Bennett was still wearing her wristwatch, earrings, had her car keys, and her cellphone was found at the crime scene.

None of these arguments are persuasive. To begin with, although no one actually saw appellant stab Bennett, the evidence suggests she was stabbed before she moved away from the Honda vehicle and collapsed on the ground. Less than an hour later, appellant was seen driving a green Honda, and he was apprehended possessing a knife that was later determined to have traces of Bennett's blood on it. Appellant wore a white t-shirt the night he was apprehended, and two witnesses provided testimony that indicated the individual they saw driving the vehicle wore a white shirt. DNA from appellant's t-shirt matched the DNA profiles of both appellant and Bennett. Blood from the towel found in the car appellant was driving also matched the DNA profiles of appellant and Bennett. As for appellant's argument that there should have been a "vast amount of blood" in the car and on him, the medical examiner explained that because the fatal stab wound was to Bennett's heart, a significant amount of blood pooled inside of her chest

cavity. He stated that blood "certainly could be extruded from the wound, but it doesn't necessarily have to be."

Furthermore, the State was not required to prove a completed theft in order to prove appellant committed capital murder. He was charged by indictment with causing the death of Shearl Bennett while "in the course of committing and *attempting to commit* [emphasis added] the offense of robbery." Section 19.03(a)(2) of the Texas Penal Code provides that a person commits capital murder if he "commits murder as defined under Section 19.02(b)(1) and . . . intentionally commits the murder in the course of committing or *attempting to commit* . . . robbery." *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (emphasis added). "The State did not bear the burden of proving that the appellant completed the theft of the victim in order to establish the underlying offense of robbery or attempted robbery." *Young v. State*, 283 S.W.3d 854, 862 (Tex. Crim. App. 2009). "Rather, the requisite intent to rob may be inferred from circumstantial evidence, particularly the appellant's assaultive conduct." *Id.*

In this case, the fact that various items belonging to Bennett, including her cell phone, wallet, keys, and miscellaneous cards and papers, were found scattered on the ground near her body is circumstantial evidence that appellant attempted to rob Bennett. In addition, the jury was free to determine that appellant's former girlfriend, Thomas, was not being truthful when she did not recall telling Detective Lundberg that appellant said he was going to start robbing people because he could not find a job. This statement, attributed to appellant, is further evidence of his intent to rob Bennett. Given the combined and cumulative force of all the evidence, direct and circumstantial, there is ample evidence from which a jury could reasonably conclude appellant intentionally committed murder in the course of committing or attempting to commit robbery. Thus, the evidence is sufficient to support the jury's verdict. We overrule appellant's first issue.

## 2. Extraneous Offense Evidence

In his second issue, appellant argues the trial court erred by overruling appellant's pretrial objection to the use of any evidence of the aggravated robbery alleged to have been committed by appellant approximately 45 minutes after the instant offense.

Prior to trial, appellant filed a motion in limine that asked for a hearing regarding the aggravated robbery offense witnessed by Officer Barrett to determine "[w]hether the aggravated robbery occurred at a time sufficiently recent to have some bearing on the credibility of any witness," "[w]hether the prejudicial effect of the extraneous aggravated robbery will outweigh the alleged probative relevance of said matter," and "[w]hether the identity of the Defendant is at issue." At the pretrial motion in limine hearing, the State responded in part:

> Judge, I think the law is clear that the jury be allowed to have the viewpoint of this offense in its entirety in this case. The aggravated robbery occurs less than an hour after the alleged murder occurs. The murder weapon is seen in the defendant's hand during the commission of the aggravated robbery. The chase that occurs as a reason of that aggravated robbery—which is both a car chase and a foot chase by the Dallas Police Department—occurs only because of the viewed aggravated robbery. The finding of the knife is part of that aggravated robbery and that chase is how they find the knife and see the defendant throw the knife. And I think that to not be able to get into the aggravated robbery and its secondary chase puts a false implication in front of the jury, or false front in front of the jury of the facts of the offense how evidence was collected, how the defendant was found, how his car was found and all his actions. And I think case law is clear that although it is technically an extraneous offense due to the proximity and time from that offense until the time of the murder offense, that it would be relevant rather than try to hide things from the jury.

The trial court ruled that Officer Barrett could testify regarding the aggravated robbery, albeit for a limited purpose. But the victim of the aggravated robbery, Starks, could not testify:

> The Court has ruled that the officer can testify as to all of his probable cause to initiate the chase that led to the recovery of the victim and the alleged murder weapon to the defendant and the alleged murder weapon to the testimony of the complaining witness in the aggravated robbery case. It would, in the Court's opinion, just be cumulative and is not required. The Court wants the case tried, the murder case tried, and not the aggravated robbery case tried as much as possible. So the officer can testify to everything that he saw and everything that

–9–

he did; however, the testimony of the aggravated robbery victim is not necessary for the State's murder case, therefore, that witness is not necessary.

The following day, just before the start of voir dire, appellant's trial counsel made the following objection:

> Judge, I just would like to put on the record, for purposes of appellate purposes, as well as any other purposes of the court, a specific objection to the Court's ruling yesterday regarding the use of the aggravated robbery information that is to be testified to by Officer Bennett [sic].

> And just for clarification for the record, I am calling this Defense's Trial Objection 1. The proposal by the State was that the use of the aggravated robbery fit under the Court's ruling in *Poindexter* and *Rogers* in that the crimes were an individual criminal transaction and full proof by testimony of any one of them cannot be given without showing the others. And we object that there is a possibility of offering full proof without going into the details of the aggravated robbery and, therefore, causing more prejudicial harm to [appellant] in this case than it is probative to the jury. And it violates his due process in having a fair and neutral jury in that they are hearing about two criminal transactions in one. And our intention is to renew Trial Objection 1 prior to Officer Bennett [sic] testifying, but not to go into the details as we've just done.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court does not abuse its discretion unless its decision to admit or exclude the evidence lies outside the zone of reasonable disagreement. *See Martinez*, 327 S.W.3d at 736; *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009). We will uphold the trial court's evidentiary ruling if it was correct on any theory of law applicable to the case. *See De La Paz*, 279 S.W.3d at 344.

Only relevant evidence is admissible. *See* TEX. R. EVID. 402. Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. Rule 404(b) provides that evidence of an accused's "other crimes, wrongs or acts is not admissible to prove the character of a person in order to

show action in conformity therewith." TEX. R. EVID. 404(b). Evidence of extraneous acts "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" *Id.*

The exceptions listed in rule 404(b) "are neither mutually exclusive nor collectively exhaustive." *De La Paz*, 279 S.W.3d at 343. "The proponent of uncharged misconduct evidence need not 'stuff' a given set of facts into one of the laundry-list exceptions set out in Rule 404(b), but he must be able to explain to the trial court, and to the opponent, the logical and legal rationales that support its admission on a basis other than 'bad character' or propensity purpose." *Id.*

The State argues, in part, that evidence of the aggravated robbery was admissible because it was same transaction contextual evidence. *See Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993) (en banc). Evidence of another crime, wrong, or act may be admissible as same transaction contextual evidence when several crimes are intermixed, blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony of any one of them cannot be given without showing the others. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). The purpose of admitting extraneous evidence as same transaction contextual evidence is to place the instant offense in context. *Nguyen v. State*, 177 S.W.3d 659, 667 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). "[I]t has long been the rule in this State that the jury is entitled to know all the relevant surrounding facts and circumstances of the charged offense; an offense is not tried in a vacuum." *Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986). But same transaction contextual evidence is admissible as an exception under rule 404(b) only when the offense would make little or no sense without also bringing in that evidence, and only to the extent it is necessary to the jury's understanding of the offense. *Devoe*, 354 S.W.3d at 469.

In this case, the aggravated robbery witnessed by Officer Barrett occurred less than an hour after the instant offense. An undercover officer saw appellant threatening the aggravated robbery victim with a knife, and the police pursued appellant both in car and on foot. The knife discarded by appellant during the foot pursuit preceding his arrest was found to contain traces of Shearl Bennett's blood. Appellant drove a green Honda and wore a white t-shirt. Two witnesses provided testimony that indicated the individual they saw fleeing the murder scene wore a white shirt, and one of them described the vehicle as a small, older-model four-door Honda Accord. The recovery of the knife and the Honda would have been difficult to explain to a jury without referring to the aggravated robbery that first brought appellant to the police's attention. The jury was entitled to hear these interwoven and highly related facts. Based on this record, the trial court could reasonably conclude appellant's testimony was admissible as same transaction contextual evidence because it was necessary to the jury's understanding of the offense.

Additionally, however, evidence that is admissible under rule 404(b) may nonetheless "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403; *Mozon v. State*, 991 S.W.2d 841, 846–47 (Tex. Crim. App. 1999). A rule 403 analysis involves a balance of: (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco*

*v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).[2] Rule 403 favors admissibility, and "the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991); *see also De La Paz*, 279 S.W.3d at 343. As with rule 404, a trial court does not abuse its discretion when it admits or excludes evidence pursuant to rule 403 so long as its decision is within the zone of reasonable disagreement. *See De La Paz*, 279 S.W.3d at 343–44.

Regarding the rule 403 factors, the first two factors favor admissibility because the evidence placed the charged offense in context and served to make the fact or consequence that appellant committed the offense more probable by showing when appellant first came to the police's attention and how the knife and Honda vehicle were recovered. The State's need for that evidence was significant because it would have been difficult to explain to a jury how the knife and Honda were recovered without referring to the aggravated robbery that occurred less than an hour after the instant offense. As for the third factor, evidence that appellant committed the aggravated robbery offense was not so inherently inflammatory that it should have influenced the jury in some "irrational but indelible way." *See Wheeler v. State*, 67 S.W.3d 879, 889 (Tex. Crim. App. 2002). The fourth and sixth factors concern the tendency of the evidence to confuse or distract the jury from the main issues and the amount of time consumed by the presentation of the extraneous offense evidence. *See Gigliobianco*, 210 S.W.3d at 641. These factors likewise favor admissibility because evidence regarding the aggravated robbery did not take a significant amount of time at trial. Of nineteen witnesses called by the State, only Officer Barrett testified regarding the aggravated robbery, which he witnessed, and the aggravated robbery itself was a

---

[2] The *Gigliobianco* court noted that this newly-worded framework merely refined and built upon its previous analysis, and brought it into line with the plain text of rule 403. *See Gigliobianco*, 210 S.W.3d at 642 n.8 ("In some of our precedents, we stated that a proper Rule 403 analysis included, but was not limited to, four factors: (1) the probative value of the evidence, (2) the potential of the evidence to impress the jury in some irrational yet indelible way, (3) the time needed to develop the evidence, and (4) the proponent's need for the evidence. By our decision today, we do no more than refine and build upon our previous analysis, and bring it in line with the plain text of Rule 403.") (citation omitted).

small part of the State's evidence. The State presented evidence of the car and foot chases that immediately followed the aggravated robbery, but these pursuits resulted in the apprehension of appellant, the recovery of the knife, and the Honda vehicle. The fifth factor concerns "a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds. For example, 'scientific' evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence." *Id.* (citation omitted). Testimony relating to the aggravated robbery was not prone to such a tendency, as it concerned matters easily understandable by a jury. Thus, the fifth factor also weighs in favor of admission. For all of these reasons, then, we conclude that the probative value of the evidence regarding the aggravated robbery was not substantially outweighed by the danger of unfair prejudice or any other rule 403 concerns. *See* TEX. R. EVID. 403; *Gigliobianco*, 210 S.W.3d at 641–42. We overrule appellant's second issue.

The trial court's judgment is affirmed.

/ Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
131489F.U05



# Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

WILLIAM PAUL LANGRUM, Appellant

No. 05-13-01489-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 5, Dallas County, Texas
Trial Court Cause No. F11-60330-L.
Opinion delivered by Justice Myers. Justices
Bridges and Lang-Miers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 3rd day of February, 2015.

-15-

## NOTICE
## OFFENDER NOTARY PUBLIC SERVICE

Under both Federal law (28 U.S.C § 1746) and State law (V.T.C.A. Civil Practice & Remedies Code, §132.001-132.003), offenders incarcerated in Texas may use an unsworn declaration under penalty of perjury in place of a written declaration, verification, certification, oath, or affidavit sworn before a Notary Public.

In a request for Notary Public service, each offender must explain why an Unsworn Declaration is insufficient before Notary Public service will be provided.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*An **example** of an unsworn declaration pursuant to **State law** is as follows:*

"My name is __William     Paul     Langrum__ . my date of birth is __10-20-1983__
       (First)    (Middle)    (Last)

and my inmate identifying number, is __1884962__ . I am presently incarcerated in

__Polunsky__ in __Livingston__
    (Corrections unit name)           (City)

__Polk__ __Texas__ __77351__ . I declare under penalty of
(County)      (State)      (Zip Code)

perjury that the foregoing is true and correct.

Executed on the __3__ day of __March__ , 20__15__ . __William Paul Langrum II__
                                                (Offender Signature)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*An **example** of an unsworn declaration pursuant to **Federal law** is as follows:*

I _____(insert offender name and TDCJ number), being presently incarcerated in _____ (insert TDCJ unit name), in _____County, Texas, declare under penalty of perjury that the foregoing is true and correct.

Executed on the _____day of_____, 20___. _____"
                                             (Offender Signature)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## NOTICE
## NOTARY PUBLIC SERVICE DENIAL

Regarding your request for Notary Public service, insufficient justification was provided necessitating Notary Public service. However, you may proceed with an Unsworn Declaration.

_____         _____
    (Signature - Notary)                          (Date)